IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 95-50306

P.F. FLORES, ARCHBISHOP OF
SAN ANTONIO,

                                        Plaintiff-Appellant,

and

UNITED STATES OF AMERICA,

                                        Intervenor-Plaintiff-
                                        Appellant,

                        versus

CITY OF BOERNE, TEXAS,

                                        Defendant-Appellee.

Appeals from the United States District Court
for the Western District of Texas

January 23, 1996

Before HIGGINBOTHAM, EMILIO M. GARZA, and BENAVIDES, Circuit
Judges.


HIGGINBOTHAM, Circuit Judge:

        The City of Boerne, Texas, contends that Congress lacks the
authority to enact the Religious Freedom and Restoration Act of
1993, Pub. L. No. 103-141, 42 U.S.C. § 2000bb et seq.  The district
court agreed.  We are persuaded that the act is constitutional and
reverse.

I.

The Saint Peter Catholic Church in Boerne, Texas, was built in 1923. In 1991, the Archbishop of San Antonio, Bishop Flores, authorized the parish to build a larger facility.

Some months later, the City of Boerne enacted Ordinance 91-05 in order to "protect, enhance and perpetuate selected historic landmarks" and to "safeguard the City's historic and cultural heritage." The Ordinance authorized the City's Historic Landmark Commission to prepare a preservation plan with proposed Historic Districts. The City Council adopted the Landmark Commission's proposal for designating a Historic District. Saint Peter was not designated as a historic landmark but at least part of the church was included within the District. According to Archbishop Flores, the Historic District included only its facade, but the City considered the entire structure to be within the District.

In 1993, the church applied for a building permit from the City to enlarge the church building, urging that its proposed addition did not affect the church's facade. The Landmark Commission denied the permit application, and the City Council, in turn, denied the church's appeal. The church filed this suit seeking a judicial declaration that the Ordinance was unconstitutional and violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq., injunctive relief, and attorneys' fees.

The City's first mention of constitutionality came in a Proposed Joint Pre-trial Order asserting that "any interpretation or application of the Religious Freedom Restoration Act of 1993 which imposes a statutory revision in the applicable standards of First Amendment jurisprudence is not valid . . . taking into account the operative provisions of Article III, the Free Exercise Clause of the First Amendment, Section 5 of the Fourteenth Amendment, and the Tenth Amendment."  Over the church's objection, the district court granted the City leave to amend its answer to plead the unconstitutionality of RFRA as asserted in the pre-trial order.

The district court held that RFRA was facially invalid because it infringed on the authority of the judiciary "to say what the law is."  Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).  The district court reasoned that "Congress specifically sought to overturn Supreme Court precedent as found in Employment Division v. Smith through the passage of RFRA."  It was also persuaded that Congress had not invoked its power under Section 5 of the Fourteenth Amendment in enacting RFRA.  The district court certified its order for interlocutory appeal to this court pursuant to 28 U.S.C. § 1292(b) and entered a partial final judgment under Fed. R. Civ. P. 54(b).  The United States and the church appealed and petitioned for leave to appeal.  We have jurisdiction.

II.

A.

3

Employment Division, Dep't of Human Resources v. Smith, 494 U.S. 872 (1990), held that the First Amendment's Free Exercise Clause does not bar application of a facially neutral, generally applicable law to religiously motivated conduct. Id. at 881. Five months after Smith, Congress conducted its first hearing on a legislative response, the Religious Freedom Restoration Act of 1990. See, Hearing Before the Subcomm. on Civil and Constitution Rights of the House Comm. on the Judiciary, 101st Cong., 2d Sess. (1990) (hereinafter "1990 House Hearing"). The 101st Congress did not pass the bill, but it was reintroduced in the 102nd Congress, S. 2969, 102nd Cong., 1st Sess. (1991); H.R. 2797, 102nd Cong., 1st Sess. (1991), and again in the 103rd Congress. S. 578, 103rd Cong., 1st. Sess. (1993); H.R. 1308, 103rd Cong., 1st Sess. (1993).

B.

In enacting the Religious Freedom Restoration Act of 1993, Congress mandated that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government demonstrates that application of the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a),(b). RFRA applies both to Federal and State law, whether enacted before or after RFRA became effective. 42 U.S.C. § 2000bb-3(a).

Congress found that "governments should not substantially burden religious exercise without compelling justification," and

4

decried the Supreme Court's decision in Smith, asserting that it "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion."  42 U.S.C. § 2000bb(a).  The Act's stated purpose was "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened."  42 U.S.C. § 2000bb(b)(1).

III.

A.

Congress considered its constitutional authority to enact legislation to overturn Smith.  See 1990 House Hearing at 51 (statement of Rev. John H. Buchanan, Jr.).  Scholars critical of Smith found in Section 5 of the Fourteenth Amendment authority to enact RFRA.  See id. at 51, 54 (statement of Rev. John H. Buchanan, Jr.), 72-79 (letter from Douglas Laycock); Congressional Research Service, The Religious Freedom Restoration Act and The Religious Freedom Act:  A Legal Analysis 30-31 (1992) (prepared by David Ackerman).  Later hearings continued the study of Section 5 and the support it would offer to such legislation.  See Religious Freedom Restoration Act of 1991:  Hearings Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 102nd Cong., 2d Sess. 353-59 (1992) (statement of Douglas Laycock) (hereinafter  "1992  House  Hearings");  The  Religious  Freedom

5

Restoration Act: Hearing Before the Senate Comm. on the Judiciary, 102nd Cong., 2d Sess. 92-97 (1992) (statement of Douglas Laycock) (hereinafter "1992 Senate Hearing").

Some thoughtful scholars questioned the authority of Congress under Section 5, at least as far as RFRA pushed it. See, e.g., 1992 House Hearings at 385-94 (statement of Ira Lupu); 1992 Senate Hearing at 122-25 (statement of Bruce Fein). Congress ultimately believed that Section 5 of the Fourteenth Amendment granted it sufficient authority to enact the bill:

> Pursuant to Section 5 of the Fourteenth Amendment and the Necessary and Proper Clause embodied in Article I, Section 8 of the Constitution, the legislative branch has been given the authority to provide statutory protection for a constitutional value when the Supreme Court has been unwilling to assert its authority. The Supreme Court has repeatedly upheld such congressional action after declining to find a constitutional protection itself. However, limits to congressional authority do exist. Congress may not (1) create a statutory right prohibited by some other provision of the Constitution, (2) remove rights granted by the Constitution, or (3) create a right inconsistent with an objective of a constitutional provision. Because [RFRA] is well within these limits, the Committee believes that in passing the Religious Freedom Restoration Act, Congress appropriately creates a statutory right within the perimeters of its power.

H.R. Rep. No. 88, 103d Cong., 1st Sess. 9 (1993). The Senate report expressed similar views, noting that RFRA "falls squarely within Congress' section 5 enforcement power." S. Rep. 111, 103d Cong., 1st Sess. 14 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1903.

When RFRA reached the Senate floor for debate, no Senator questioned Congress' power under Section 5. The Senators expressing a view on the issue were persuaded that Section 5

6

provided ample authority.  See 139 Cong. Rec. S14469 (statement of Sen. Grassley); 139 Cong. Rec. S14470 (statement of Sen. Hatch).

B.

That the Executive and Legislative branches also have both the right and duty to interpret the constitution casts no shadows upon Justice Marshall's claim of ultimate authority to decide.  The judicial trump card can be played only in a case or controversy.  The power to decide the law is an incident of judicial power to decide cases.  There is no more.  A power of review not rooted in a case or controversy would impermissibly draw to Article III the interpretive role of the Executive and Legislative branches of government.  So it is that the familiar recitation that Congressional legislation comes to us with a presumption of constitutionality is a steely realism and not merely a protocol of manners or an empty formalism.

No party here contends and we express no opinion whether other delegations of legislative power, such as the Commerce Power, provide constitutional authority for the passage of RFRA.  RFRA's legislative history more than satisfies our requirement that "we be able to discern some legislative purpose or factual predicate that supports the exercise of [Congress' Section 5] power." E.E.O.C. v. Wyoming, 460 U.S. 226, 243 n.18 (1983).  There is no question that Congress drew on its power under Section 5 in enacting RFRA.  The district court's doubt that it did is without basis.  The issue is whether that authority was there.

IV.

7

The City contends that RFRA is unconstitutional for four related reasons. First, Congress lacked the authority to enact the statute under Section 5 of the Fourteenth Amendment. Second, the statute violates the separation of powers by returning to the courts the task of accommodating general laws and religious practices after Smith denied the judiciary's competence to do so. Third, RFRA violates the Establishment Clause of the First Amendment. Fourth, it violates the Tenth Amendment. We turn to these contentions.

A.

Section 5 of the Fourteenth Amendment provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. The Thirteenth, Fourteenth, and Fifteenth Amendments "were specifically designed as an expansion of federal power and an intrusion on state sovereignty." City of Rome v. United States, 446 U.S. 156, 179 (1980).

The Supreme Court first considered the meaning of Section 5 in Ex parte Virginia, 100 U.S. 339 (1879). It upheld the constitutionality of an act prohibiting the disqualification of grand or petit jurors on account of race. Id. at 345, 346. The Court declined to read narrowly the power granted by Section 5:

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

8

Id. at 345-46.

The civil rights legislation of the 1960's brought to court again questions regarding the power of Congress under the Civil Rights Amendments. In Katzenbach v. Morgan, 384 U.S. 641, 648 (1966), the Court rejected the argument that under Section 5 Congress could only prohibit acts that would violate the substantive provisions of the Fourteenth Amendment. Referring to M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421 (1819), the Court held that the inquiry into what is "appropriate legislation" under Section 5 is whether the statute "may be regarded as an enactment to enforce [the Fourteenth Amendment], whether it is 'plainly adapted to that end' and whether it is not prohibited by but is consistent with 'the letter and spirit of the constitution.'" Id. at 651.

Six years later, the Court reaffirmed this reading of Section 5. In Oregon v. Mitchell, 400 U.S. 112, 118 (1970), the Court upheld congressional prohibitions of literacy tests in state and national elections. Mitchell did strike down the guarantee of the right of 18-year-olds to vote in state elections, 400 U.S. at 118, but that decision rested on the exclusive role of states in conducting their elections. Justice Black explained that Congress' enforcement power was broad but not unlimited:

> As broad as the congressional enforcement power is, it is not unlimited. Specifically, there are at least three limitations upon Congress' power to enforce the guarantees of the Civil War Amendments. First, Congress may not by legislation repeal other provisions of the Constitution. Second, the power granted to Congress was not intended to strip the States of their power to govern themselves or to convert our national government of

9

enumerated powers into a central government of unrestrained authority over every inch of the whole Nation. Third, Congress may only "enforce" the provisions of the amendments and may do so only by "appropriate legislation." Congress has no power under the enforcement sections to undercut the amendments' guarantees of personal equality and freedom from discrimination, or to undermine those protections of the Bill of Rights which we have held the Fourteenth Amendment made applicable to the States.

Id. at 128-29 (opinion of Black, J.).

In the years since Mitchell, the Court has adhered to these generally stated principles. In Fitzpatrick v. Bitzer, 427 U.S. 445 (1976), the Court upheld, against a federalism-based Eleventh Amendment challenge, the application of Title VII, 42 U.S.C. § 2000e et seq., to the States. The Court explained that "[w]hen Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional amendment whose other sections by their own terms embody limitations on state authority." Id. at 456. Similarly, in Fullilove v. Klutznick, 448 U.S. 448 (1980), a plurality of the Court expressed the view that Section 5 provided authority to remedy the effects of past discrimination, even though the Fourteenth Amendment only prohibited purposeful discrimination. See id. at 478 (opinion of Burger, C.J., joined by White and Powell, JJ.); id. at 500-02 (Powell, J., concurring). The Court in Adarand Constructors, Inc. v. Pena, 115 S.Ct. 2097, 2117 (1995), in holding that federal affirmative action programs are subject to strict scrutiny, did not question congressional power under Section 5. Id. at 2114.

10

The Thirteenth, Fifteenth, Eighteenth, Twenty-third, Twenty-fourth, and Twenty-six Amendments contain parallel grants of enforcement power to Congress. The Court has read those provisions in a similar fashion. For example, in South Carolina v. Katzenbach, 383 U.S. 301, 326 (1966), the Court upheld provisions of the Voting Rights Act of 1965. Discussing Congress' power under Section 2 of the Fifteenth Amendment--which contains virtually identical language to Section 5 of the Fourteenth--the Court wrote that "[t]he basic test to be applied in a case involving § 2 of the Fifteenth Amendment is the same as in all cases concerning the express powers of Congress with relation to the reserved powers of the States." Id. at 326. Quoting Chief Justice Marshall's opinion in M'Culloch, the Court explained:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with letter and spirit of the constitution, are constitutional.

Id. at 326 (quoting M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421 (1819)). Similarly, in James Everard's Breweries v. Day, 265 U.S. 545, 560 (1924), the Court, addressing the scope of Congress' power under Section 2 of the Eighteenth Amendment, held that Congress "may adopt any eligible and appropriate means to make [the Eighteenth Amendment's] prohibition effective."

This continued adherence to the principle that Congress may explicate textually located rights and obligations pursuant to Section 5 persuades us that the three-part test from Morgan remains the benchmark.

1.

The first inquiry under <u>Morgan</u> is whether RFRA "may be regarded" as an enactment to enforce the Fourteenth Amendment. It has been long established that the Due Process Clause of the Fourteenth Amendment incorporates the Free Exercise Clause of the First Amendment. <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 303 (1940).

We disagree with the City's argument that Congress' Section 5 authority is more limited when it acts to enforce provisions other than the Equal Protection Clause. Section 5 does not place conditions on Congress' authority to enforce the amendment. Congress has the power to enforce "the provisions of this article," not just the Equal Protection Clause. <u>United States v. Price</u>, 383 U.S. 787, 789 & n.2 (1966) (noting Section 5 empowers Congress to enforce "every right guaranteed by the Due Process Clause of the Fourteenth Amendment"); <u>see</u> <u>also</u> Cong. Globe, 42d Cong., 1st Sess. App. at 83 (1871) ("The fourteenth amendment closes with the words, 'the Congress shall have power to enforce, by appropriate legislation, the provisions of this article'--the whole of it, sir; all the provisions of the article; every section of it.") (statement of Rep. Bingham). We reject the notion that there is any relevant hierarchy of constitutional rights within the Fourteenth Amendment. <u>Cf.</u> <u>Caplin & Drysdale, Chartered v. United States</u>, 491 U.S. 617, 628 (1989). At base, this argument is little

12

more than an invitation to revisit the incorporation of the First Amendment, an invitation addressed to the wrong court.

We think it beyond peradventure that Congress enacted RFRA to enforce the religious liberty protected from State infringement by the Due Process Clause.  RFRA expressly declares its purpose "to restore the compelling interest test . . . and guarantee its application in all cases where free exercise of religion is substantially burdened" and "to provide a claim or defense to persons whose religious exercise is substantially burdened by government."  42 U.S.C. § 2000bb(b).  The Act itself defines "exercise of religion" as that under the First Amendment.  See 42 U.S.C. § 2000bb-2(4).

RFRA's legislative history leaves little room for doubt that Congress intended "to enforce the right guaranteed by the free exercise clause of the first amendment."  S. Rep. 111 at 14 n.43, reprinted in 1993 U.S.C.C.A.N. at 1904. Witnesses at congressional hearings spoke eloquently of the need for legislation to defend individuals, particularly those from minority religions, from generally applicable laws that burden the exercise of religion. See, e.g., 1992 House Hearings at 157-59 (statement of Edward Gaffney, Jr.); 1992 Senate Hearing at 5-6 (statement of William Nouyi Yang), 37-39 (statement of Dallin Oaks).  Indeed, the Senate Judiciary Committee found the need for legislation to restore the pre-Smith compelling interest test in order "to assure that all Americans are free to follow their faiths free from governmental

13

interference."  S. Rep. 111 at 8, reprinted in 1993 U.S.C.C.A.N. at 1897-98.

2.

The second inquiry under Morgan is whether RFRA is "plainly adapted to that end."  Although Congress' power to enforce the Amendment is not confined to "abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional," Morgan, 384 U.S. at 648-49, Section 5 does not permit Congress to rewrite the scope of the Amendment's provisions out of whole cloth. Rather, Congress' power under Section 5 is remedial.  Congress' constitutional power to legislate pursuant to Section 5 is tied to Congress' superior ability to find and redress nascent or disguised violations of the Amendment.  In short, "Congress may act only where a violation lurks."  E.E.O.C. v. Wyoming, 460 U.S. at 260 (Burger, C.J., dissenting).

The United States offers three remedial justifications for RFRA:  1)  RFRA deters governmental violations of the Free Exercise Clause; 2) RFRA prohibits laws that have the effect of impeding religious exercise; and, 3) RFRA protects the free exercise rights of adherents of minority religions.  We address each in turn.

The United States urges that RFRA is an effective means of prohibiting the unconstitutional targeting of religion through facially neutral laws.  According to this view of RFRA, Smith's requirement that individuals show that a law is not facially neutral or generally applicable has not been an effective means of

14

rooting out laws hostile to a religion in particular or to religion in general. RFRA responds by requiring all laws that substantially burden the exercise of religion to pass the compelling interest test, a test well-suited to separating well-intentioned statutes from invidious ones. Cf. City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493 (1989) (O'Connor, J.) (noting that purpose of strict scrutiny is to "smoke out" illegitimate uses of race).

Congress could have reasonably concluded that Smith's focus on facial neutrality and general applicability has been ineffective in identifying laws motivated by antagonism to a religion or to religion in general. As one witness testified before the Senate Judiciary Committee, "formally neutral, generally applicable laws have repeatedly been the instruments of religious persecution, even in America." 1992 Senate Hearing at 71 (statement of Douglas Laycock). Moreover, Congress found that "[a]fter Smith, claimants will be forced to convince courts that an inappropriate legislative motive created statutes and regulations. However, legislative motive often cannot be determined and courts have been reluctant to impute bad motives to legislators." H.R. Rep. 88 at 6. These considerations, analogous to those underlying the Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, § 3, 96 Stat. 131, 134, convince us that RFRA serves the remedial goal of identifying budding or disguised constitutional violations that would otherwise survive judicial scrutiny under Smith.

In a similar vein, the United States argues that even if the Constitution only prohibits governmental action taken with the

15

intent of interfering with religious exercise, Congress may go farther, as it did with RFRA, and prohibit conduct that has the effect of burdening the exercise of religion. According to this view of RFRA, applying the compelling interest test to all laws, whether facially neutral or not, that have the effect of substantially burdening the exercise of religion is a prophylactic measure designed to ensure that government may not discriminate against a particular religion or religion in general. It is claimed to be an effective means of identifying both mature and sprouting constitutional violations, a prophylactic measure that prohibits some laws whose effect upon the free exercise of religion is so substantial that RFRA is fairly said to regulate incipient constitutional violations.

In cases involving racial discrimination, the Court has held that Congress may prohibit laws with a racially discriminatory effect, as it did in the Voting Rights Act of 1965, as an appropriate method of promoting the Amendment's purpose, even if the Constitution only prohibits laws with a racially discriminatory intent. City of Rome, 446 U.S. at 177. Similarly, Congress could reasonably conclude that prohibiting laws that have the effect of substantially burdening religion promotes the free exercise of religion. Congress heard much testimony regarding the severe burdens that facially neutral laws can impose on an individual's exercise of his religious beliefs. See, e.g., 1992 House Hearings at 157-59 (statement of Edward Gaffney, Jr.) (discussing effect of Smith on various religious exercise).

16

A robust application of the compelling interest test may be uneven in exempting religious practices from statutes of general applicability and push courts into either an uncomfortable judging of the credibility of claims that practices are religious exercises or leaving each person a non-regulatable island unto themselves, arguably concerns behind the pre-Smith timidity of its use. The concerns are large and, for some scholars, they are a compelling argument against RFRA. Christopher L. Eisgruber & Lawrence G. Sager, Why the Religious Freedom Restoration Act is Unconstitutional, 69 N.Y.U. L. Rev. 437, 452 (1994). But this begs the question of congressional power. That some generally applicable laws must yield their unwitting grasp of religious practices is the price Congress has chosen to pay to achieve its desired level of accommodation. "It was for Congress, as the branch that made this judgment, to assess and weigh the various conflicting considerations." Morgan, 384 U.S. at 653. "It is enough that we be able to perceive a basis upon which the Congress might resolve the conflict as it did." Id.

Finally, the United States claims that RFRA serves to protect religious minorities, thereby promoting the goals of both the Due Process Clause and the Equal Protection Clause. According to this view of RFRA, adherents of minority religions are disproportionately affected by facially neutral laws. Congress heard testimony regarding the effects of Smith on members of the Hmong, Jewish, Mormon, and Amish faiths. See 1992 Senate Hearing at 30-40; 1992 House Hearings at 104, 107-08, 406-09. Congress

17

could reasonably conclude that more exacting scrutiny of facially neutral legislation that burdens a religious practice is needed to protect adherents of minority religions.  See S. Rep. 111 at 8, reprinted in 1993 U.S.C.C.A.N. at 1897.

Relatedly, Congress could reasonably conclude that seeking religious exemptions in a piecemeal fashion through the political processes, particularly at the state or local governmental level, would place minority religions at a disadvantage.  See The Federalist No. 10 (James Madison).  Smith acknowledged that leaving accommodation to the political processes risked discriminatory treatment but viewed it as an "unavoidable consequence of democratic government."  494 U.S. at 890.  Congress considered the effect the Smith decision would have on minority religions seeking accommodations through the political process and concluded that "State and local legislative bodies cannot be relied upon to craft exceptions from laws of general application to protect the ability of the religious minorities to practice their faiths."  S. Rep. 111 at 8, reprinted in 1993 U.S.C.C.A.N. at 1897; see also 1992 House Hearings at 326 (statement of Douglas Laycock).

These justifications fit within the remedial power of Congress under Section 5.  To our eyes, Congress considered the need for "appropriate legislation" to enforce the provisions of the Fourteenth Amendment and responded with legislation that is "plainly adapted" to that end.

3.

18

The third inquiry under Morgan is whether RFRA is consistent "with the letter and spirit of the constitution."  This inquiry requires us to determine whether RFRA violates any other provision of the Constitution.  Congress's power to remedy constitutional wrongs is a one-way street.  Congress may not violate other constitutional provisions while enforcing those of the Fourteenth Amendment.  Morgan, 384 U.S. at 656.  The City claims that RFRA violates three Constitutional provisions:  1) the separation of powers; 2) the Establishment Clause; and 3) the Tenth Amendment.

The City treats these arguments as independent of its Section 5 argument:  Even if Section 5 authorizes Congress to enact RFRA, it is unconstitutional for these additional reasons.  However, as Morgan makes clear, Congress has no power under Section 5 to violate other individual rights.  Stated another way, if RFRA violates other constitutional provisions, it exceeds Congress' Section 5 authority.  We will address each separately.

B.

The district court agreed with the City that RFRA violates the separation of powers by displacing the authority of the judiciary, established by Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803), "to say what the law is."  RFRA accomplishes this goal, according to the City, by reversing Smith and restoring the pre-Smith judicial standard for evaluating free exercise claims.  In effect, Congress has created a new constitutional right and achieved a "substantive expansion of First Amendment doctrine."  In short, the City describes RFRA as nothing less than a

19

constitutional coup d'etat, declaring that "[t]he new order under RFRA would overrule Marbury and craft a new standard of constitutional responsibility."  The United States responds that RFRA "is simply a statute that provides legislative protection for a constitutional right over and above that provided by the Constitution."

The response that Congress has created a statutory right is facile and ultimately incomplete.  RFRA creates a statutory right to be sure.  The origins and framing of that right, however, are drawn from judicial decisions construing the Constitution.  We will not pretend that RFRA is anything but a direct response to the Supreme Court's decision in Smith.  Indeed, Congress' announced purpose was "to 'turn the clock back' to the day before Smith was decided."  H.R. Rep. 88 at 15 (statement of Rep. Hyde).  Moreover, RFRA speaks in terms familiar to constitutional adjudication.  To pass muster under RFRA, applicable laws must further a "compelling governmental interest" and be the "least restrictive means" of furthering that interest.  This is a statutory rule, but it is a rule mandating a process rejected by the Court in Smith.

RFRA is also, in a sense, an assignment by Congress of a higher value to free-exercise-secured freedoms than the value assigned by the courts--that is, strict scrutiny versus a form of intermediate scrutiny.  This view includes an image of congressional second-guessing of the courts.  But that sense is false.  Congress by RFRA is demanding ad hoc review of laws of general applicability that substantially burden the free exercise

20

of religion. This is functionally a regulation of nascent violations of the Free Exercise Clause, at least so long as the statutory trigger of <u>substantial</u> effect is given full force. It is true that the Court found that the Free Exercise Clause did not require the Court to accommodate laws of general applicability not aimed at a religious practice and that RFRA demands that the Court engage in an exercise that the Court has eschewed. Nonetheless, whether the courts must obey RFRA's command to do so turns only on the independent issue of the power of Congress under Section 5.

As we have otherwise explained, this is indistinguishable in any relevant way from the congressional command to examine election practices adversely impacting the voting strength of protected minorities, even though there was no purpose to discriminate and, hence, no violation of the Equal Protection Clause. Dispensing with the constitutionally rooted requirement that discrimination be purposeful is an extraordinary exercise of power. The insistence in <u>Washington v. Davis</u>, 426 U.S. 229, 239 (1976), upon proof of discriminatory purpose was a decision about the judicial role. At issue was whether the accent should be upon federal courts as arbiters of social justice or as a more passive arbiter of cases or controversies. The role of purpose becomes clear in the debate over its wisdom. <u>Compare</u> Laurence H. Tribe, American Constitutional Law § 16-20 at 1515 (2d ed. 1988) (urging that anti-subjugation should be test rather than purpose) <u>with</u> Patrick E. Higginbotham, Laurence Tribe's Visionary Theories of the Equal Protection Clause, 4 Benchmark 125, 131-34(1990) (rejecting Tribe's

21

view).  The merits of that debate aside, it was common ground that dispensing with the requirement of <u>Washington v. Davis</u> that violations of the Equal Protection Clause must be purposeful works a large relocation of power.  This is not to suggest that RFRA's dispensing with purpose is of a lesser magnitude.  We doubt that it is.  Rather, the point is that despite its large role, dispensing with purpose remains nonetheless an exercise of Congress' remedial power, the power to reach conduct that only threatens the free exercise of religion.

Undeniably, RFRA's origins and codification of terms drawn directly from constitutional decisions make it unusual and are characteristic of what is termed a "foundational statute."  The critical question is whether they make RFRA unconstitutional.  We think not.

The City's argument rests on the mistaken assumption that <u>Smith</u> describes not only how little the Government <u>must</u> accommodate religion but also how much it <u>may</u> accommodate it.  Stated another way, the City must contend that <u>Smith</u> held not only that facially neutral laws having the incidental effect of burdening religion do not violate the Free Exercise Clause but also that exemptions to such laws do violate either that clause or the Establishment Clause.  Only if the latter proposition is true does RFRA usurp the judiciary's duty to interpret the Constitution.

This view of <u>Smith</u> has its supporters, <u>see</u> Christopher L. Eisgruber & Lawrence G. Sager, Why the Religious Freedom Restoration Act is Unconstitutional, 69 N.Y.U. L. Rev. 437, 450

22

(1994).  Prior to Smith, the Court recognized that legislatures were free to enact religious exemptions more expansive and accommodating than that required by the Free Exercise Clause.  See Zorach v. Clauson, 343 U.S. 306 (1952); Corporation of Presiding Bishop v. Amos, 483 U.S. 327, 334 (1987).  Even when the Court held that a particular religious accommodation violated the Establishment Clause, Justice Brennan cautioned that "we in no way suggest that all benefits conferred exclusively upon religious groups or upon individuals on account of their religious beliefs are forbidden by the Establishment Clause unless they are mandated by the Free Exercise Clause."  Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 18 n.8 (1989) (Brennan, J.).

Smith, however, did not change this rule.  To the contrary, the Court contemplated "leaving accommodation to the political process:"

> Values that are protected against government interference through enshrinement in the Bill of Rights are not thereby banished from the political process. Just as a society that believes in the negative protection accorded to the press by the First Amendment is likely to enact laws that affirmatively foster the dissemination of the printed word, so also a society that believes in the negative protection accorded to religious belief can be expected to be solicitous of that value in its legislation as well.

494 U.S. at 890.  The Court noted with approval that several States, unlike Oregon, had exempted the sacramental use of peyote from their drug laws.  Id.

Since Smith, the Court has reaffirmed that religious accommodations are constitutional.  "Our cases leave no doubt that in commanding neutrality the Religion Clauses do not require the

23

government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice." Board of Educ. of Kiryas Joel v. Grumet, 114 S.Ct. 2481, 2492 (1994). Rather, "'government may (and sometime must) accommodate religious practices . . . .'" Id. (quoting Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 144 (1987)).

The City's separation of powers argument challenges this well-established rule. Every legislatively mandated accommodation of religion reflects a legislature's judgment regarding the free exercise of religion. RFRA does not usurp the judiciary's authority to say what the law is any more than did the Voting Rights Act of 1964 when it prohibited literacy tests after Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45 (1959), had upheld their constitutionality. Nor does RFRA usurp the judiciary's interpretive powers any more than did the American Indian Religious Freedom Act Amendments of 1994, Pub. L. No. 103-344, 108 Stat. 3125, which overturns the particular result of Smith by preventing States from prohibiting Native Americans from using peyote as part of their religious practices. See 42 U.S.C. § 1996a(b)(1).

That RFRA speaks in broad generalities where other legislatively mandated religious exemptions, such those provided by the American Indian Religious Freedom Act, address specific conduct is of no moment. Within the area of permissible legislative accommodations of religion, Congress may paint with a broad or narrow brush. In either situation, Congress has "disagreed" with

24

the judiciary regarding the scope of religious freedom and the Free Exercise Clause.  In neither situation has Congress arrogated to itself the unrestricted power to define the Constitution.

In short, the judiciary's duty is to say what the law is, but that duty is not exclusive.  The district court's holding that RFRA usurps the judiciary's power under Marbury v. Madison to interpret the Constitution is incorrect.

Nor are we persuaded by the City's argument that RFRA violates the separation of powers because it restores a test rejected in Smith as beyond the judiciary's competence to apply.  Smith acknowledged that the legislative accommodation of religion "must be preferred to a system . . . in which judges weigh the social importance of all laws against the centrality of all religious beliefs."  494 U.S. at 890.  However, the Court's rejection of the compelling interest test did not rest on judicial inability to apply the test.  The compelling interest test is familiar to judges both in the context of free exercise claims, see Smith, 494 U.S. at 900-01 (O'Connor, J., concurring in the judgment), and elsewhere.  See, e.g., Adarand, 115 S.Ct. at 2117 (subjecting all racial classifications to strict scrutiny).

Rather, the Court's rejection of the compelling interest test in free exercise claims rested on the Court's aversion to applying the test to facially neutral laws in the counter-majoritarian arena of constitutional interpretation.  See 494 U.S. at 888-889 (rejecting compelling interest test because it "would open the prospect of constitutionally required religious exemptions").

25

Again, it is one thing to apply the compelling interest test drawn from a statute where Congress can amend the underlying law if it disagrees with the resulting balance; it is another when the only response to the judiciary's application of the compelling interest test is a constitutional amendment.

We conclude that RFRA does not violate the separation of powers. Whether RFRA's requirement that judges determine whether a particular law "substantially burdens" the exercise of religion imposes upon the judiciary the duty of inquiring into the centrality of particular practices to a faith and whether that duty, if it exists, poses constitutional difficulties is not presented. See Smith, 494 U.S. at 887 & n.4. As we have explained, the full meaning of "substantially burdens" must be found in its application. It is self-evident that the vigor of the insistence that effects be substantial and the risks of error in locating incipient violations of the Free Exercise Clause are directly related. An anemic application of "substantial effect" pushes the limits of congressional power to remedy.

C.

Nor does RFRA mandate religious accommodations that violate the Establishment Clause. To the contrary, the act provides that "[n]othing in this chapter shall be construed to affect, interpret, or in any way address [the Establishment Clause]." 42 U.S.C. § 2000bb-4. In short, RFRA by its own terms provides that the accommodations mandated by RFRA may reach up to the limit permitted by the Establishment Clause but no further.

26

The City responds that, even so, RFRA on its face violates the Establishment Clause because it lacks a secular purpose and because it has the primary effect of advancing religion. See Lemon v. Kurtzman, 403 U.S. 602 (1971). We disagree. Its remedial justifications belie the City's contention that Congress acted with a sectarian purpose. Relatedly, "it is a permissible legislative purpose to alleviate significant governmental interference" with the exercise of religion. Amos, 483 U.S. at 335.

RFRA no more advances religion than any other legislatively mandated accommodation of the exercise of religion. In Amos, the Court rejected the argument that an accommodation violates the primary effects prong of the Lemon test simply by virtue of being an accommodation. "A law is not unconstitutional simply because it allows churches to advance religion, which is their very purpose. For a law to have forbidden 'effects' under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence." Id. at 337 (emphasis in original). RFRA's lifting of "substantial burdens" on the exercise of religion does not amount to the Government coercing religious activity through "its own activities and influence."

D.

Finally, the City urges that RFRA violates the Tenth Amendment because the act limits the power of the States to legislate "in the traditional areas of state sovereignty and prominence." The City mistakenly relies on the Court's decision last term in United States v. Lopez, 115 S.Ct. 1624 (1995), which held that the Gun

27

Free School Zones Act exceeded Congress' power under the Commerce Clause. Congress, however, enacted RFRA pursuant to its power under Section 5 of the Fourteenth Amendment. Although the United States urges that the Commerce Clause also supports Congress' authority to enact RFRA, we have not reached that contention.

The Court has repeatedly noted that "the principles of federalism that constrain Congress' exercise of its Commerce Clause powers are attenuated when Congress acts pursuant to its powers to enforce the Civil War Amendments." Gregory v. Ashcroft, 501 U.S. 452, 468 (1991). On its face, RFRA does not intrude upon state sovereignty any more than the myriad other federal statutes that preempt state regulation.

That said, we do not suggest that the Tenth Amendment plays no role. Gregory itself recognized that the Court "has never held that the Amendment may be applied in complete disregard for a State's constitutional powers." Id. To the contrary, "the Fourteenth Amendment does not override all principles of federalism." Id. at 469. Indeed, the Court in Gregory refused to construe a congressional act to reach state governmental functions in the absence of a clear statement from Congress that it intended to do so. Id. at 470. Such questions of RFRA's applicability to particular areas of state regulation, however, are best left for individual, case-by-case resolution. It is enough for us to conclude that RFRA on its face does not violate the Tenth Amendment.

V.

28

We hold that Section 5 of the Fourteenth Amendment empowered Congress to enact the Religious Freedom Restoration Act. We further hold that RFRA does not usurp the judiciary's power to interpret the Constitution. Accordingly, we REVERSE the order of the district court holding the Religious Freedom Restoration Act unconstitutional on its face and REMAND for further proceedings not inconsistent with this opinion.