John W. GERHARDT, Plaintiff,

v.

Alan LAZAROFF, et al., Defendants,

and

Lee Hampton, et al., Plaintiffs,

v.

Reginald Wilkinson, et al., Defendants,

and

John Miller, et al., Plaintiffs,

v.

Reginald Wilkinson, et al., Defendants.

Nos. C2–95–517, C2–97–382, C2–98–275.

United States District Court,
S.D. Ohio,
Eastern Division.

Feb. 25, 2002.

David A. Goldberger, Ohio State Univ. College of Law, Columbus, OH, for Plaintiffs.

Todd Robert Marti, Ohio Attorney General's Office, Corrections Litigation, Columbus, OH, for Defendants.

*OPINION AND ORDER*

SARGUS, District Judge.

These three cases, one pending before the undersigned Judge, one pending before Judge James L. Graham, and one pending before Magistrate Judge Terence P. Kemp, have been consolidated for the purpose of issuing a single ruling on defendants' motion to dismiss. The sole issue raised by the motion is the constitutionality of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*

In a Report and Recommendation filed on August 27, 2001, Magistrate Judge Kemp, to whom the motion had been referred for an initial decision pursuant to 28 U.S.C. § 636(b), recommended that the defendants' motion be denied, with the exception of that portion directed to plaintiffs' claims under the Ohio Constitution. Defendants objected to that recommendation, continuing to argue that RLUIPA was not a constitutional exercise of Congress' power under either the Spending Clause or the Commerce Clause. All of the plaintiffs, including the United States, which intervened in order to defend the constitutionality of RLUIPA, filed responses to the objections, and the defendants filed a reply. For the following reasons, the objections will be overruled and defendants' motion for partial dismissal will be denied with the exception of that portion directed to plaintiffs' claims under the Ohio Constitution.

I.

The facts of this case are essentially those set forth in the Magistrate Judge's Report and Recommendation. Because, for the most part, defendants' challenge is a legal challenge and not dependent upon the facts of any particular case, a lengthy recitation of the facts is unnecessary.

However, as more fully discussed below, there are certain facts which the defendants assert have been established for purposes of the Court's ruling and which, they claim, were overlooked or improperly disregarded by the Magistrate Judge. The Court will comment on those factual issues in the context of discussing the legal objections which defendants have raised.

Otherwise, the facts are relatively straightforward. Each of the plaintiffs claims to have been denied the right to practice his religion in the prison setting due to what plaintiffs assert are unwarranted concerns about security or unjustified assumptions about the relationship between plaintiffs' chosen religion and prison gang activity, primarily White Supremacy gangs. Although plaintiffs originally contended that their constitutional rights were being violated under the *Turner v. Safley* standard, *see Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), after RLUIPA was enacted, they contended that the more restrictive standards set forth in that statute applied to the state's actions. The State of Ohio then sought a ruling from the court that RLUIPA is unconstitutional.

## II.

Defendants challenged RLUIPA on grounds that its enactment exceeded Congress' powers under either the Spending Clause or the Commerce Clause of the United States Constitution. The Magistrate Judge determined that the Spending Power provided adequate support for the enactment of RLUIPA, and consequently did not reach the Commerce Clause issue. Defendants argued both that the Magistrate Judge's conclusions with respect to the Spending Clause are erroneous, and that the Magistrate Judge erred in refusing to reach the arguments relating to the Commerce Clause. For the following reasons, the Court finds each of defendants' objections to be without merit.

Defendants first argue that a statute such as RLUIPA which imposes a "least restrictive means" test on the actions of prison officials is too vague to be enforceable in the prison setting. Defendants argue that, although this test governs the actions of a state when dealing with private citizens' First Amendment concerns, it not only has the potential to lead to judicial second-guessing in the prison setting, but has, when applied in the past, produced judicial decisions diametrically opposed to each other, thus leaving prison officials without sufficient guidance to determine how to implement RLUIPA's requirements.

The short answer to defendants' arguments is that any statute which contemplates judicial review under a standard which is not susceptible to mechanical and precise definition has the potential to lead to conflicting judicial decisions on similar sets of facts. This potential result is not fatal to the enforceability of the statute. The Court further believes that defendants' continued reliance on *Turner v. Safley, supra,* is unavailing. In *Turner,* the Supreme Court was interpreting a provision of the Constitution. In doing so, it weighed the constitutional rights of inmates against the realities of the prison setting. Although the Court did not conclude that the First Amendment required imposition of a "least restrictive means" test, Congress, in enacting RLUIPA, has decreed otherwise with respect to a narrow class of First Amendment claims. Once Congress makes that decision, it is the Court's duty to implement it unless the statute exceeds Congress' power or is otherwise unconstitutional. The fact that the Supreme Court did not impose such a high standard absent a congressional directive to do so is, by itself, not persuasive on the issue of whether Congress had the power to impose a higher standard if it so chose.

Defendants make several arguments which, they claim, should have been resolved by the Magistrate Judge on the basis of their "uncontroverted" affidavits. They contend that, as a factual matter, (1) there is an inadequate relationship between the federal funds provided and the purposes of RLUIPA; (2) that any such relationship is not proportional to the amount of federal funds utilized in the prison programs in Ohio; and (3) that the enforcement of RLUIPA in the prison setting will necessarily involve burdening other inmates by placing them at a greater risk of physical harm because RLUIPA will prevent prison officials from restricting activities of other prisoners which pose legitimate security threats. In response, plaintiffs argue primarily that these are all matters of "legislative" fact and that defendants in an individual case may not, by entering affidavits into the record, compel the Court to reach the conclusion that, for example, to enforce RLUIPA would necessarily burden other inmates. That is a judgment, according to plaintiffs, which Congress is free to make and which the Court may overturn only if it is irrational.

The Court agrees with plaintiffs on this issue. For the most part, defendants have raised a facial challenge to RLUIPA's constitutionality, and have not contended that under the facts of any of the specific cases pending before the Court, applying RLUIPA would produce unconstitutional results. When evaluating a facial challenge to a statute, the Court must be careful not to allow the legislative findings underlying enactment of the statute to be "trumped by the fact finding apparatus of a single court." *Anheuser–Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir.1995), *vacated on other grounds*, 517 U.S. 1206, 116 S.Ct. 1821, 134 L.Ed.2d 927 (1996), *reaffirmed* 101 F.3d 325 (4th Cir.1996), *cert. denied* 520 U.S. 1204, 117 S.Ct. 1569, 137 L.Ed.2d 714 (1997). Beyond that fundamental point, however, the Court is persuaded

that the United States has demonstrated an adequate relationship between the purpose of the federal funds and the purposes of RLUIPA, and that the four-part test set forth in *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) has been satisfied here.

Defendants' reliance on *FCC v. League of Women Voters*, 468 U.S. 364, 399–400, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) for its proportionality argument is also misplaced. Importantly, that case involved a Congressional enactment which, if validated, would have restricted the First Amendment free speech rights of the recipients of federal funds. In the context of a First Amendment challenge, the Court held that there must be a substantial relationship between the purpose of the funding and the interests sought to be advanced by the First Amendment restrictions. Otherwise, Congress could simply not "justify the substantial abridgment of important journalistic freedoms which the First Amendment jealously protects." *Id.* at 402, 104 S.Ct. 3106. By contrast, Congress passed RLUIPA to enlarge rather than restrict the free exercise of religion, and the First Amendment concerns identified in *League of Women Voters* are not present here. Further, the radio stations at issue in that case were prohibited from spinning off affiliates to carry on the work which Congress had prohibited, so that it was impossible for them to carry out their free speech activities by segregating the Congressional funds from the entity which performed those activities.

As the plaintiffs contend, the state has, among other things, the recourse simply to choose not to accept federal funding. If the funding is, as defendants assert, a de minimis portion of the state prison budget, then Ohio has more incentive to forego federal funding of its prisons. Should it do so, the State would not be subject to

RLUIPA under a Spending Clause theory. Since Ohio has continued to accept federal funds after RLUIPA's enactment, however, it has clearly not chosen this alternative.

Defendant's other primary argument is that RLUIPA constitutes governmental endorsement of religion. The Court adopts the Report and Recommendation's conclusion that the government's decision to lift burdens on the free exercise of religion is not tantamount to government endorsement of either a particular religion or religion in general. The Supreme Court has specifically upheld government enactments in the free exercise area which allow religion to be exercised in a manner which the First Amendment does not compel, and those enactments have been upheld as a valid exercise of Congress' power in this area. Government action which operates to accommodate the exercise of religion is not tantamount, by itself, to an unconstitutional endorsement of religion. *Corporation of the Presiding Bishop of the Church of Latter–Day Saints v. Amos,* 483 U.S. 327, 337, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987).

Finally, the Court agrees with the Magistrate Judge that there was no need to reach the Commerce Clause issue in this case. It is a sound exercise of judicial discretion not to decide issues which are unnecessary to the outcome of the case. Because RLUIPA can be sustained on either of the two grounds advanced by the plaintiffs and the Court has found one of those grounds to be sufficient, any decision on the Commerce Clause issue would be an advisory opinion. Although the possibility exists that the Court of Appeals would disagree with this Court's analysis of the Spending Clause issue and might therefore be required to reach the Commerce Clause argument, that is not a justification for deciding a difficult constitutional issue when that decision is unnecessary to permit the case to proceed.

## III.

Based upon the foregoing, the objections to the Magistrate Judge's Report and Recommendation are OVERRULED and the Report and Recommendation is ADOPTED. The defendants' motion to dismiss is DENIED with the exception that plaintiffs' claims asserted directly under the Ohio Constitution are DISMISSED. Case No. C–2–97–382 is returned to Judge Graham for further proceedings. Case No. C–2–95–517 will, unless objections are filed within ten days, be returned to Magistrate Judge Kemp for further proceedings on the assumption that the only issue which the non-consenting party, the United States, intended to argue was the constitutionality of RLUIPA, and that the parties do not have further objections to that case proceeding to adjudication on the merits before Magistrate Judge Kemp.

## REPORT AND RECOMMENDATION

KEMP, United States Magistrate Judge.

Plaintiffs in these consolidated cases are Ohio prisoners who desire to practice a religion not traditionally recognized by the Ohio Department of Rehabilitation and Corrections ("ODRC"). All plaintiffs advance similar claims that ODRC staff have interfered with the practice of their respective religions or that staff have subjected them to illegal or unconstitutional treatment because they attempted to assert their religious beliefs. These allegations include: (1) denial of access to religious literature and/or items necessary to practice their religion; (2) denial of the opportunity to conduct religious services; (3) denial of the freedom to conform their dress or appearance to that required by

their religion; (4) denial of a prison chaplain specifically trained in and dedicated to their religion; and (5) retaliation and discrimination by ODRC staff resulting from attempts to advance and practice their religion. All have amended their complaints to assert that ODRC's practices violate the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*

The defendants have moved to dismiss the RLUIPA claims, arguing that the statute may not be constitutionally applied to the States. The United States has intervened to defend the constitutionality of RLUIPA. Although the motions to dismiss filed in cases C–2–95–517 and C–2–98–275 were originally to have been decided by the undersigned in a final decision, as authorized by 28 U.S.C. § 636(c), the United States did not consent to that disposition. Thus, this Report and Recommendation is being issued pursuant to 28 U.S.C. § 636(b)(1)(B) and Eastern Division Order 95–2. For the following reasons, it will be recommended that the motions to dismiss plaintiffs' RLUIPA claims be denied.

## I.

Although the defendants styled their motion as one to dismiss, both they and the plaintiffs have submitted evidentiary materials outside the pleadings. There are disputes about the admissibility of some of this material. The Court's disposition of the motion is not primarily fact-based, and it moots the parties' dispute about evidentiary materials. The Court will set forth only those facts necessary to put the legal issues into context. Most, if not all, of the facts recited below are not disputed and many have been stipulated.

### A. *Current Plaintiffs and Ohio's Experience Under RFRA*

In *Gerhardt,* Case No. C2–95–517, the plaintiff is a member and ordained minister of the Church of Jesus Christ Christian ("CJCC"), a subdenomination of the Christian Identity movement. This church espouses theory contrary to more traditional Christian dogma, including a belief that the races should be separated, and seeks to advance these beliefs through the Aryan Nation, the church's political division. In *Miller,* Case No. C2–98–275, members of the plaintiff class are followers of the Asatru religion, also known as Odinism, Vor Tru, or Troth. This polytheistic religion of Northern Europe originated with the Vikings and includes Thor, the Norse God of Thunder, among its pantheon of gods. Finally, in *Hampton,* Case No. C2–97–382, plaintiff J. Lee Hampton is a member of the Wiccan religion and a practicing "witch," while plaintiff Jon B. Cutter is an avowed Satanist. For purposes of the instant motion, defendants concede that these are *bona fide* religions and that the plaintiffs do genuinely hold these beliefs. It is also undisputed that the defendants have refused to grant some or all of the religious requests made by the plaintiffs.

The defendants assert that the denial of many of the plaintiffs' requests was justified because the practices and/or articles in question pose a security risk to the institution, either by advancing inflammatory practices or ideologies tending to incite violence or by sheltering otherwise illicit gang activity. For example, defendants claim that the practice of Asatru has been tied to the 1993 riot at the Southern Ohio Correctional Facility, as well as various murders, escapes, or attempted escapes at the Madison, Trumbull, Lebanon, and Mansfield Correctional Institutions. Similarly, the defendants contend that the CJCC is affiliated with the Aryan Brotherhood, a group allegedly involved in criminal activity and violence within the Ohio prison system. Both groups are allegedly linked to white supremacist activities and violent crime in the public at large. Plain-

tiffs, however, deny that their respective religions are involved with any violent activity, condone or espouse any act of violence, or pose any security threat to the various correctional institutions of the Ohio prison system. Although both parties discuss these issues in their memoranda, the Court is not required to determine, in the context of the pending motions to dismiss, the relationship, if any, between plaintiffs' religious beliefs and prison security. Rather, the issue is whether defendants must meet RLUIPA's higher standard of justifying security-based restrictions on religion, or only the lower pre-RLUIPA standard.

The defendants also detail the allegedly onerous effects that Congress' last effort to legislate a higher standard of scrutiny to evaluate prisons' efforts to regulate inmates' religious practices—the Religious Freedom Restoration Act, or RFRA—imposed upon ODRC operations and staff before its application to the States was declared unconstitutional in *Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). According to defendants, the number of religions espoused by Ohio prisoners proliferated under RFRA, and the religions in question often demanded distinctly unorthodox religious services and items, such as martial arts classes. Furthermore, a considerable amount of state resources were consumed addressing prisoner litigation efforts. According to defendants, ODRC religious administrators were spending between 75 and 90 percent of their time addressing RFRA litigation and operational issues, forcing them to neglect their other religious duties. In one case alone, ODRC and Ohio Department of Youth Services employees spent more than 125 hours in connection with depositions and more than 900 hours responding to over 300 separate document requests. More than 70 cases involving RFRA were active during this same time period. The significance, if any,

of these matters to the constitutionality of RLUIPA will be addressed below.

**B.  *History and Enactment of RLUIPA***

In 1993, in response to the Supreme Court's decision in *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), Congress enacted the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C.2000bb *et seq.* pursuant to either its Enforcement Power or Preventive Power under § 5 of the Fourteenth Amendment. In *Smith,* the Supreme Court held that a law of general applicability, such as Oregon's law precluding employees who were terminated for "good cause" from receiving unemployment benefits, need not be supported by a "compelling state interest" in order to pass constitutional muster. RFRA outlawed governmental attempts to "substantially burden" any person's exercise of religion, "even if the burden results from a rule of general applicability," unless the law furthered a compelling state interest and was the least restrictive means of furthering that interest. The Supreme Court, however, held in *Boerne* that this legislative attempt by Congress exceeded its power to legislate under Section 5 of the Fourteenth Amendment, and that the statute was therefore unconstitutional as applied to the States. *Boerne,* 521 U.S. at 536, 117 S.Ct. 2157.

Congress subsequently attempted to enact similar or identical statutes pursuant to other enumerated powers. The first bills, S. 2148 and H.R. 4019 (105th Congress) (entitled the Religious Liberty Protection Acts), apparently died of neglect during the Clinton impeachment proceedings and failed to move out of committee in either House of Congress. The 1999 versions, S.2081 and H.R. 1691 (106th Congress), passed the House but failed to clear the Senate, drawing substantial opposition

from various civil rights groups who feared the proposed legislation would undermine various anti-discrimination laws.

The following year, after considering testimony about the difficulties that various institutionalized individuals experienced in practicing their faith, the Senate passed a bill limiting the applicability of the proposed legislation to state actions affecting land use and the institutionalized. As it relates to institutionalized persons, the Act contains a textual provision virtually identical to RFRA, but premises its authority on the spending and commerce powers entrusted to Congress under the Constitution. Thus, it prohibits governments from imposing, for any but compelling reasons, substantial burdens on the religious exercise of institutionalized persons if those burdens are "imposed in a program or activity that receives Federal financial assistance, or if the burden affects interstate or foreign commerce or commerce with Indian tribes." 42 U.S.C. § 2000cc–1(b). Furthermore, although it provides judicial remedies for unnecessary restrictions on religious liberty, Congress specifically noted that it expected the federal courts, when considering potential claims of the institutionalized, to "continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources." Joint Statement, 146 Cong. Rec. at S7775. Senate Bill S. 2869 (106th Congress) was not considered by committee but was passed on July 27, 2000 after only 47 minutes of debate. It was transmitted to the House that same evening and was passed, again without committee consideration, 16 minutes later. With President Clinton's signature, the bill became law effective September 22, 2000 and is codified at 42 U.S.C. § 2000cc *et seq.*

## C. *ODRC Funding and Operations*

Because RLUIPA was passed by Congress as an exercise of its Commerce and/or Spending Power, the parties have submitted evidence relating to (1) the degree to which the ODRC receives federal financial support and the source of any such funds, and (2) the extent to which the ODRC conducts activities which may be construed to constitute interstate commerce. *See* Joint Stipulation, C2–97–382 File doc # 93, C2–95–517 File doc. # 106. The Joint Stipulation has been supplemented by a subsequent affidavit filed by Horst Gienapp, Grants Administrator for the ODRC. (C2–98–275 File doc. # 190). The pertinent facts are as follows.

### 1. *Federal Funding of ODRC*

Congress regularly provides grants to the ODRC to achieve a number of different objectives, either as direct grants from a federal agency to the ODRC or as federal funds generally allocated to other Ohio departments which are subsequently transferred to the ODRC. The purpose of any given grant is usually gleaned from one of two sources: the Catalog of Federal Domestic Assistance, jointly published by the United States General Services Administration, the Executive Office of the President, and the Office of Management and Budget, or by an individualized statement accompanying the grant articulating what aspect of ODRC operations the particular federal agency is intending to fund. As of September 22, 2000, the effective date of RLUIPA, the ODRC apparently had received 22 different federal grants. Second Affidavit of Horst Gienapp at 2.

Of these 22 grants, some are directed to support generalized construction, research, and operational efforts of the ODRC and, as a result, are not given or expended directly to fund specific prison inmate programs. Two of the largest of such grants are the Violent Offender Incarceration and

Truth In Sentencing Incentive Grants ("VOI/TIS") and the State Criminal Alien Assistance Program ("SCAAP"). The former, provided by the United States Department of Justice, is intended to provide states with funds to build or expand violent offender confinement capacity. Ohio has received approximately $69,000,000 over the last three years under the program; over $12,000,000 was applied for and awarded for the current year but has not yet been received. The latter program reimburses the ODRC for costs it incurs to incarcerate aliens convicted of felonies in Ohio. Under this program, Ohio traditionally receives an annual award of approximately $1,000,000. It received $1,300,000 last year. The most recent application for funds under this program is still pending. Similar federal funding efforts are intended to create and maintain support programs for ODRC staff, such as stress management programs. A second broad category of federal grants are specifically allocated to support prisoner education, vocational training and assistance, and drug treatment programs. A third and final broad category of grants go directly to support prisoner subsistence. These include monthly grants under the Federal School Breakfast Program and the Federal School Lunch Program, currently totaling more than $1,200,000.

Federal grant programs generally require the ODRC to submit applications for these various grants. This procedure, pending Congressional continuation of the programs and approval of the ODRC's request, involves a delay between request for and receipt of the relevant funds. Although the ODRC made applications for and was awarded federal grants after September 22, 2000, as of the date of the stipulation it had not received any funds pursuant to applications made after RLUIPA's effective date. The ODRC, however, expects to continue to apply for funds under these programs and, assuming continued Congressional support, expects to receive such funds. It may have done so by the date of this Report and Recommendation.

### 2. ODRC's Relationship with Interstate Commerce

The ODRC has established business agreements and regularly conducts transactions in intrastate and interstate commerce. The ODRC operates a program entitled Ohio Prison Industries ("OPI") in which inmates produce goods and services, some of which are sold to buyers outside the ODRC. Often using raw materials produced outside of Ohio, Ohio inmates produce products such as shoes, beds, furniture, and mulch for the state of Ohio. Although the state agencies generally pay the ODRC for these goods, they do so at a cost allowing the state to recognize substantial savings. For example, Ohio achieves savings of approximately $1,000,000 annually by purchasing highway safety reflectors produced and/or recycled by OPI. The ODRC also sells some of these products to departments of corrections in other states. The ODRC has provided computer data-entry services to Unibase, a Utah Corporation, under a program maintained since 1987. Approximately 80 to 100 inmates at the Lebanon Correctional Institution and 50 inmates at the London Correctional Institution currently participate in the program. An additional 50 inmates at the Ohio Reformatory for Women are expected to enter the program shortly. Inmates also provide various services to Ohio departments, such as attaching snowplows and salt spreaders to state vehicles, and the ODRC is paid for these services.

Like any institution, the ODRC engages in commerce by acquiring the goods and services it requires to operate. Although each ODRC institution is largely responsible for its own purchasing,

some expenditures in interstate commerce may be generalized among the state's correctional facilities. For example, Orient Correctional Institution's ("OCI") regular purchase of computers and motor vehicles, including two such vehicles last year, is representative of purchasing at the other institutions. Although OCI and Pickaway Correctional Institution ("PCI"), as the location of Frasier Medical Center, incur somewhat disproportionate medical expenses (amounting to approximately $2,000,000 annually, with an additional $20,000 to $60,000 spent monthly on mental health medications), all of the ODRC's facilities purchase a substantial amount of medical supplies and pharmaceuticals in interstate commerce. Ameritech and Qwest, both non-Ohio companies, are paid approximately $1,800 and $500 per month, respectively, for providing ODRC facilities with local and long-distance telephone service. ODRC also enjoys an exclusive contract with MCI, an interstate corporation, by which it receives a percentage of the revenue attributable to the collect calls placed by the prison population to locations inside and outside of Ohio. The ODRC also engages outside corporations to manage Ohio prisons. Management and Training Corporation, a Utah corporation, is paid a per diem of $36.40 to operate the 1380 beds at the Lake Erie Correctional Institution in Conneaut, while CiviGenics Corporation, a Massachusetts corporation, is paid $55.39 a day to operate the 552 beds at the North Coast Correctional Treatment Facility in Grafton. No plaintiff in the instant action, however, has been incarcerated at either of those two facilities.

Finally, the ODRC enjoys interstate relationships and engagements providing for the housing and subsequent evaluation of its prison population. Ohio is a member of an interstate corrections compact, pursuant to O.R.C. § 5120.50, which provides for agreements between Ohio and twenty other states to exchange and house prisoners on a reciprocal basis, and Ohio currently houses and exchanges prisoners under the program. A similar agreement with the Federal Board of Prisons currently provides for reciprocal housing of state and federal prisoners, and prisoners are currently incarcerated under this program. Finally, Ohio enjoys cooperative arrangements with other states involving the evaluation and monitoring of prisoners currently released on probation or parole, and thousands of such individuals are involved in these programs annually. The plaintiffs do not contend that these compacts and agreements substantially burden their ability to exercise their religion.

## II.

One of plaintiffs' claims is that ODRC's actions violate the Ohio Constitution. Defendants have moved to dismiss these claims on Eleventh Amendment grounds and under O.R.C. § 9.86. Plaintiffs' memorandum does not offer any response to these arguments. Because it appears that plaintiffs do not oppose the dismissal of their Ohio constitutional claims, it will be recommended that defendants' motion be granted as to these claims.

## III.

### A. *Introduction*

After the parties fully briefed the constitutionality of RLUIPA as an issue of first impression, the United States District Court for the Eastern District of California, in *Mayweathers v. Terhune*, 2001 WL 804140 (July 2, 2001), rejected the same constitutional challenges raised by the defendants here. This Court is in full agreement with the result reached in *Mayweathers*, at least to the extent that it addresses the same issues decided in this Report and Recommendation, but because these issues have not been addressed by

any other courts, this Court's analysis of the Spending Clause issue will be somewhat more detailed.

Additionally, plaintiffs have raised an issue about the ripeness of the defendants' motion. They argue that the issue of RLUIPA's constitutionality is not ripe for decision because if defendants can demonstrate "that the plaintiffs' religious claims are merely a 'cover' for gang activities, . . . this Court can decide this case on non-statutory and non-constitutional grounds." Plaintiffs' Joint Reply, at 12.

Apparently, plaintiffs' position is that if a claim asserted in a complaint may eventually turn out to be factually unsupported, the Court should defer a decision on the legal sufficiency of the claim until the facts can be evaluated either through a summary judgment motion or at trial. To do so would be to deprive a defendant of the right to have a claim's legal sufficiency tested by way of a motion to dismiss, and would force a defendant to litigate the claim even if the facts alleged by the plaintiff would not support recovery. That is why Fed.R.Civ.P. 12(b)(6) allows motions to dismiss, and also why plaintiffs have not advanced a valid reason to delay a decision on defendants' motion.

### B. *General Principles*

Envisioning a government where the legislature would be but one of three co-equal branches, the Framers established limits on congressional legislative power "in order to ensure protection of our fundamental liberties." *Gregory v. Ashcroft*, 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (*quoting Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 232 (1985)(internal quotation marks omitted)). It follows from the constitutionally-mandated division of authority among the three branches of the federal government, as well as from the division of governmental power between the federal government and the states, that Congressional acts are valid only when effectuated through one or more specifically enumerated Constitutional powers. "The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written." *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803). However, an act of Congress is presumptively constitutional and should only be invalidated when it is clear Congress exceeded its enumerated powers in passing such legislation. *United States v. Morrison*, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *United States v. Harris*, 106 U.S. 629, 635, 1 S.Ct. 601, 27 L.Ed. 290 (1883). The Court must therefore determine whether Congress exceeded its Commerce Clause and/or Spending Clause powers in enacting RLUIPA.

### C. *Commerce Clause*

Congress asserted that it enacted RLUIPA pursuant to its Commerce Clause power, *see* 42 U.S.C. § 2000cc–1(b)(2), and plaintiffs contend that such effort was constitutional. Defendants, however, contend that the statute, as written and as applied to the ODRC's regulation of inmates' religious exercise, exceeds Congress's powers under the Commerce Clause.

■ The Commerce Clause issue in this case is fairly narrow. Congress may constitutionally regulate three main areas or activities of "commerce." First, Congress may regulate the channels of interstate commerce. *See United States v. Lopez*, 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256–257, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Second, Congress may regulate to protect the instrumentalities of interstate commerce, or persons or things involved in interstate commerce, even though the threat being regulated against arises from

intrastate activities. *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624; *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). Finally, Congress may regulate activities which have a "substantial [e]ffect" on interstate commerce. *Lopez,* 514 U.S. at 558–559, 115 S.Ct. 1624; *Morrison,* 529 U.S. at 608–609, 120 S.Ct. 1740. Plaintiffs concede that Congress enacted RLUIPA as an example of this last class of activities, seeking to remove substantial burdens on religious practices by prisoners which "affect" commerce. 42 U.S.C. § 2000cc–1(b)(2).

▆ In order for a statute constitutionally to regulate activities which have a substantial effect on interstate commerce, one of three prerequisites must be satisfied: (1) the relationship between the regulated activities and interstate commerce must be readily apparent; (2) Congress must have made specific and supportable factual findings concerning that relationship; or (3) the statute must place the burden on the party seeking enforcement to allege and demonstrate that relationship. *See Lopez, supra; Harrison, supra; see also United States v. Riddle,* 249 F.3d 529, 536 (6th Cir.2001). The parties' briefs focus on the third prerequisite, and raise issues both about the sufficiency of the statutory language and the likelihood that ODRC's limitations on inmates' religious exercise could ever be shown to have a substantial effect on interstate commerce.

Congress also enacted RLUIPA pursuant to its authority under the Spending Clause. In the Court's view, the Commerce Clause issues are the more difficult, requiring substantial construction of the statutory language and raising serious questions about the relationship between the internal operation of state prisons and interstate commerce. Because RLUIPA can be found to be constitutional if it was a valid exercise of Congress' authority under either the Spending Clause or the Commerce Clause, the undersigned will forego further discussion of the Commerce Clause as being unnecessary to the Court's resolution of defendants' motion to dismiss.

### D. *Spending Clause*

▆ The Constitution also explicitly empowers Congress to "provide for the . . . general Welfare of the United States." U.S. CONST. Art. I, § 8, cl. 1. The Supreme Court has long made clear that Congress may expend funds in areas or enterprises even though its constitutional power to legislate that area or enterprise may be limited: "the power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution." *United States v. Butler,* 297 U.S. 1, 66, 56 S.Ct. 312, 80 L.Ed. 477 (1936). In making such expenditures, however, Congress may constitutionally condition receipt of federal funds "upon compliance by the recipient with federal statutory and administrative directives" by the states "to further broad policy objectives" Congress might not otherwise be able to effect through direct legislation. *Fullilove v. Klutznick,* 448 U.S. 448, 474, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)(Burger, C.J.); *see also South Dakota v. Dole,* 483 U.S. 203, 206–207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987); *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 16–17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Despite this broad assertion, Congress' spending power has never been viewed as unlimited. The Supreme Court has identified four broad constitutional circumscriptions of the spending power. *See, e.g., Dole,* 483 U.S. at 207, 107 S.Ct. 2793; *Pennhurst,* 451 U.S. at 17, 101 S.Ct. 1531.

▆ The first limitation on this power is derived from the language of the spending clause itself. *See* U.S. CONST., Art. I, § 8, cl. 1. An exercise of the Spending

Power is permissible only when it is in the pursuit of "the . . . general Welfare of the United States." *Dole*, 483 U.S. at 207, 107 S.Ct. 2793; *see also Helvering v. Davis*, 301 U.S. 619, 640–641, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); *Butler*, 297 U.S. at 65, 56 S.Ct. 312. The second limitation requires that any conditions on the federal grant be clearly presented to the States for their acceptance or rejection along with the grant itself. *Dole*, 483 U.S. at 207, 107 S.Ct. 2793. The third requirement is that the conditions on the federal grant be related to the federal interest involved in the various national projects or programs. *New York v. United States*, 505 U.S. 144, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Dole*, 483 U.S. at 207–208, 107 S.Ct. 2793. The last requirement is that Congress' exercise of its Spending Power not violate any other constitutional provision. *Dole*, 483 U.S. at 208, 107 S.Ct. 2793. The Court will separately discuss each of these four limitations in light of defendants' argument that RLUIPA represents an unconstitutional exercise of Congress' Spending Power.

### 1. *Pursuit of the General Welfare*

■ Defendants do not seriously contend that RLUIPA does not further the general welfare of the United States. The Supreme Court has recognized that a determination of what constitutes the "general welfare" of the citizens is left to Congress' discretion "unless the choice is clearly wrong [or] a display of arbitrary power [rather than] an exercise of judgment." *Helvering*, 301 U.S. at 640, 57 S.Ct. 904. The concept of the general welfare is not static, and "[n]eeds that were narrow or parochial a century ago may be interwoven in our day with the well-being of the nation." *Id.*, at 641, 57 S.Ct. 904. Recent decisions have recognized that "[t]he level of deference to the congressional decision is such that the Court has more recently questioned

whether 'general welfare' is a judicially enforceable restriction at all." *Dole*, 483 U.S. at 207 n. 2, 107 S.Ct. 2793, *citing Buckley v. Valeo*, 424 U.S. 1, 90–91, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)(per curiam). Consequently, the Court holds that RLUIPA is sufficiently related to the general welfare of the United States to survive a constitutional challenge on that ground.

### 2. *Timely and Unambiguous Statement of Conditions.*

■ Although presented in *Dole* as a single element of the four-point test, the second requirement actually encompasses the consideration of two interrelated constitutional concerns. First, any condition imposed by Congress on the receipt of federal funds must be "unambiguous" so that "states [may] exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531; *see also Dole*, 483 U.S. at 207, 107 S.Ct. 2793. Thus, a state must be able "to ascertain what is expected of it" by the language of the statute. *Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531. Consequently, the conditions must be articulated in a way that allows a state to be certain of the consequences of its obligation to enforce the requirement. Second, such conditions may not be imposed on the states after the funds have been received. "[T]hough Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25, 101 S.Ct. 1531. Defendants contend that the application of RLUIPA in this case offends the Constitution on both grounds and, as a result, the second prong of the *Dole* test cannot be met.

Taking these issues in reverse order, the Court turns first to the retroactivity issue.

Both plaintiffs and the United States concede that RLUIPA was not intended to apply to federal funds disbursed prior to its effective date and that it could not constitutionally do so. However, the plaintiffs are seeking only prospective relief under RLUIPA. Defendants have stipulated that, after RLUIPA's effective date, and even after plaintiffs amended their complaint to include a claim under RLUIPA, they made additional applications for federal funds. Although, at the time the parties entered into their stipulations, defendants had not actually received any funds pursuant to their post-RLUIPA applications, defendants acknowledged that they expected to receive such funds as early as August, 2001, the month in which this Report and Recommendation is being issued, and that they will continue their long-standing practice of applying for and receiving federal funds as this lawsuit progresses. Consequently, this case clearly presents the question of whether Congress intended to condition the receipt of those funds applied for and disbursed after September 22, 2000 upon compliance with RLUIPA, and whether it did so in a constitutional manner. In short, no retroactivity issue is raised by the facts of this case.

The more serious issue raised by defendants' motion is whether the first prong of the "notice" criterion has been satisfied. Defendants present two arguments: (1) that RLUIPA's language is not sufficiently clear to advise the states that compliance with RLUIPA is a condition attached to the receipt of federal funds; and (2) even if the language is clear enough to advise the states that they are receiving funds conditioned upon compliance with RLUIPA, what amounts to "compliance" is so vague and fact-specific that the states cannot reasonably comprehend what obligations they are accepting if they continue to receive federal funds to be used in prison operations. Neither of these arguments has merit.

Defendants' first argument relies heavily on the *Pennhurst* case. *Pennhurst* held that a specific section of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. §§ 6000 *et seq.*, was not intended to be an enforceable condition on the states' receipt of federal funds under that Act. In so holding, the Court contrasted the language of the "Bill of Rights" portion of the Act, 42 U.S.C. § 6010, with other sections of the same statute, and observed that "[n]oticeably absent from § 6010 is any language suggesting that § 6010 is a 'condition' for the receipt of federal funding under the Act." *Pennhurst*, 451 U.S. at 13, 101 S.Ct. 1531. The Court also examined the relevant legislative history and the overall structure of the Act, and reached the conclusion that although Congress intended other provisions of the Act to impose new legal duties upon states which accepted funding under the Act, § 6010 did not do so. *Id.* at 21–27, 101 S.Ct. 1531. Defendants assert that this case is controlled by *Pennhurst* because the drafters of RLUIPA failed to use the word "condition" or an equivalent term, and that *Pennhurst* requires any expression of Congressional intent to be that precise. *See also Dole*, 483 U.S. at 208, 107 S.Ct. 2793 (noting that "the conditions upon which States receive the funds [under 23 U.S.C. § 158, which explicitly directs the Secretary of Transportation to withhold funds from states in which persons under the age of 21 are permitted to purchase or possess alcoholic beverages] ... could not be more clearly stated by Congress").

A common-sense reading of RLUIPA as a whole is sufficient to refute defendants' argument. 42 U.S.C. § 2000cc–1, the specific section of RLUIPA which applies to institutionalized persons, begins with these

words: "No government shall impose a substantial burden on the religious exercise of a person . . . confined in an institution . . . ." To argue that such language is a mere "congressional preference for certain kinds of treatment" as opposed to language which "create[s] rights and obligations," *Pennhurst*, 451 U.S. at 18–19, 101 S.Ct. 1531, is to ignore the plain meaning of the phrase "[n]o government shall . . . ." "Shall" is quintessentially a word associated with obligations and rights. The creation of a private right of action in § 2000cc–2 to enforce this obligation ("[a] person may assert a violation . . . as a claim . . . in a judicial proceeding and obtain appropriate relief against a government") certainly suggests that Congress intended states receiving federal funds for prison programs or activities to be held accountable for breaching the obligation set forth in § 2000cc–1. Finally, §§ 2000cc–3(c) and (d) would be entirely unnecessary if the statute were simply intended to "nudge" the states in the direction of imposing lesser burdens on the free exercise of religion by institutionalized persons, *Pennhurst*, 451 U.S. at 19, 101 S.Ct. 1531, *quoting Rosado v. Wyman*, 397 U.S. 397, 413, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Those subsections make it clear that the Act "may *require* a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise" and that the only activity affected by the Act is that of "a government *as a condition of receiving funding or other assistance* [for its programs or activities]" (emphasis supplied). The language of RLUIPA, fairly read, strongly evinces Congress' intent "to require the States to fund new, substantial rights," *Pennhurst*, 451 U.S. at 18, 101 S.Ct. 1531, and therefore makes it clear to states which continue to apply for federal funding for prison programs that they will be subject to RLUIPA.

Furthermore, the language used in the Act closely parallels other federal statutes conditioning federal funding that have long been deemed to satisfy the notice requirement. *See, e.g., Davis v. Monroe County Bd. Of Educ.*, 526 U.S. 629, 649–650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)(involving Title IX, 20 U.S.C. § 1681(a), which states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance"); *Guardians Ass'n v. Civil Service Com'n of City of New York*, 463 U.S. 582, 598–599, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)(involving Title VI, 42 U.S.C. § 2000d, which states, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance"). Consequently, the Court holds that RLUIPA adequately expresses Congress' intent to condition further payment of federal funds to state prison programs upon the states' compliance with RLUIPA.

Assuming that Congress did intend to make the states' continued receipt of funds for prison activities or programs conditional upon compliance with RLUIPA, defendants argue that the wording of the statute is too vague to allow them to make an informed choice as to whether or not to accept such funds. In the memorandum supporting the motion to dismiss, defendants, relying on *dictum* from *Pennhurst*, argue that the requirement that they use the "least restrictive means" to implement otherwise permissible restrictions on an inmate's exercise of religion "is so context-driven and subjective as to be no standard at all . . . ." Defendants' Memorandum, at 27. In their reply, defendants expand

their argument, describing the Supreme Court's decision in *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) and a large number of decisions from lower courts as a "significant body of precedent ... [striking] down similar spending statutes." Defendants' Reply, at 7.

*Pennhurst*, of course, did not strike down 42 U.S.C. § 6010 as an impermissibly vague exercise of the Spending Power. Rather, it held that § 6010 was not an exercise of the Spending Power at all. Similarly, the issue in *Suter* was whether certain language in the Adoption Assistance and Child Welfare Act of 1980, *see* U.S.C. § 671, provided for either a private right of action in favor of beneficiaries of the Act, or created rights assertable in an action under 42 U.S.C. § 1983, to enforce the states' obligation to use "reasonable efforts" to keep biological families intact. In light of the fact that the only statutory obligation imposed on the states by § 671 was to submit a plan to the Secretary dealing with efforts to eliminate the need to remove children from their homes, the Court held that:

> Careful examination of the language relied upon by respondents, in the context of the entire Act, leads us to conclude that the "reasonable efforts" language does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term "reasonable efforts" in this context is at least as plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary in the manner previously discussed. .

*Id.* at 362–363, 112 S.Ct. 1360. The Court did not invalidate the Act as an impermissibly vague exercise of the Spending Power but specifically noted that the Secretary of Health and Human Services had the power to enforce the Act against the States, including the "reasonable efforts"

requirement that the defendants in this case characterize as too vague to be enforceable. *Suter*, 503 U.S. at 360–61, 112 S.Ct. 1360.

Defendants cite nine cases in addition to *Suter* which, according to their reply memorandum, support the proposition that similar language found in Spending Clause statutes has been held to be too vague to be judicially enforceable. Defendants neglect to state (and perhaps do not appreciate) that each of these cases, like *Suter*, did not consider the fundamental question of when a Spending Clause statute is so vague that a state cannot reasonably be required to comply with its mandates. In every case cited by defendants, the issues were (1) whether the statute at issue was enforceable by private individuals in a suit brought pursuant to § 1983, (2) whether a private right of action could be implied directly under the statute, or (3) both. The specificity of the obligations imposed upon the states by the statute in question is one of several factors pertinent to these questions, but in none of these cases did the court hold that the statute itself was an invalid exercise of Congress' Spending Power, and several, including *Suter*, made it perfectly clear that the statutes imposed valid obligations on the states, even if no private individual was entitled to sue for a violation of those obligations. Defendants' effort to obscure the difference between what is a valid exercise of the Spending Power and when, absent a specific Congressional intent to create a private cause of action, a private individual may sue to enforce that valid exercise of the Spending Power, is, at the least, unhelpful to the ultimate resolution of this issue.

Despite the fact that defendants did not cite a single case which invalidated any portion of a statute enacted pursuant to Congress' Spending Power on vagueness grounds, the Court will still address the

issue presented. Obviously, the wording of RLUIPA parallels that of the "strict scrutiny" standard developed by the Supreme Court and used in a number of different Constitutional analyses, including religious accommodation cases. *See, e.g., Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)(religious accommodation); *Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest"); *U.S. v. Playboy Entertainment Group,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)(first amendment). This standard has been used in Constitutional jurisprudence for at least the last 100 years. Furthermore, this standard has been used to analyze many constitutional complaints of prisoners prior to the Supreme Court's decision in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), *see, e.g., Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), and under RFRA prior to the *Boerne* decision.

The Court concludes first, that this standard is not so vague that States cannot reasonably appreciate the obligations they are choosing to undertake by continuing to accept federal money for prison programs. It is true that state officials will be required to evaluate religious freedom claims somewhat differently than under *Turner,* and that to some extent they will be subject to judicial "second-guessing" as to whether they have chosen the "least restrictive means" of implementing compelling state interests. The fact that they cannot predict with 100% accuracy exactly how they will be required to respond to any specific inmate's request for an accommodation of his or her religious practices, however, does not mean that state officials are left completely in the dark as to what

RLUIPA will generally require them to do. Indeed, defendants' own memoranda are replete with details of what compliance with RFRA entailed. RLUIPA puts the states on notice that a similar response will be required under its terms. If Ohio does not wish to return to the pre-*Boerne* RFRA days, it can simply refuse the money.

Moreover, in light of the case law cited above, it is far too late in the day to suggest that RLUIPA's "strict scrutiny" standard is too vague to be judicially enforceable (if, in fact, that is even a consideration when Congress expressly provides for a private right of action under the statute). Courts have been enforcing that exact standard against state action for years. States are required to tailor their actions to that standard in almost every First Amendment situation arising outside the prison setting. Consequently, defendants' vagueness argument is an insufficient basis for invalidating RLUIPA under the Spending Clause.

### 3. *Relationship to Funding*

Next, defendants argue that there is not a substantial enough connection between federal funding for prison activities or programs and the free exercise of religion by prisoners to support RLUIPA as a valid exercise of the Spending Power. Defendants argue that the conditions here bear no relationship to the funds being provided by the state, citing *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), and that the conditions are void as unacceptably disproportionate to the relatively small percentage of funds being provided to the state, citing *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). Specifically, defendants argue that although ODRC receives federal funds for various prison programs, "none of those funds have any relation to religion." De-

fendants' Memorandum, at 28. The Court finds these contentions unfounded.

*South Dakota v. Dole* involved a challenge to Congress' effort to encourage all states to raise the legal drinking age to 21. The statute at issue in that case, 23 U.S.C. § 158, authorized the Secretary of Transportation to withhold a percentage of federal highway funds otherwise allocable to any state where the minimum drinking age was under 21. As in this case, the state argued that Congress had exceeded its Spending Power by conditioning the receipt of federal funds designated for one purpose (i.e. the construction and maintenance of highways) on the states' compliance with Congress' wishes in an unrelated matter, namely the minimum drinking age. Although the Supreme Court acknowledged in *Dole* that prior cases had, "without significant elaboration," suggested this limitation, *id.* 483 at 207, 107 S.Ct. 2793, it soundly rejected the states' challenge to § 158, holding that the drinking age issue was "directly related to one of the main purposes for which highway funds are expended—safe highway travel." *Id.* at 208, 107 S.Ct. 2793.

Defendants have failed to cite a single decision, either from the Supreme Court or any other court, which struck down an exercise of the Spending Power because the purpose of the funds was not reasonably related to the encumbering condition imposed upon their receipt. Both *Rust v. Sullivan, supra,* and *League of Women Voters, supra,* were decided on other grounds, and *Rust* upheld the federal restrictions at issue, thus undercutting the force of defendants' assertion that plaintiffs have failed "to explain how RLUIPA's agency-wide mandate can be squared with the Court's decision[ ] in ... *Rust* ...." Reply brief, at 11. Plaintiffs cite to the Eighth Circuit's decision in *Jim C. v. United States,* 235 F.3d 1079 (2000) (*en banc*), *cert. denied,* 533 U.S. 949, 121 S.Ct. 2591,

150 L.Ed.2d 750 (2001), as a recent example of a holding supporting a broad interpretation of the "reasonably related" requirement, and that court did reject, at least implicitly, the dissenters' view that the condition attached to receipt of funds under the Rehabilitation Act (the states' waiver of their Eleventh Amendment immunity from suit under the Act) "bears no direct relationship ... to the purpose of most federal grants to the state for education." *Id.* at 1083 (Bowman, J., dissenting).

The Court will assume (although the *Dole* Court expressly refused to decide the question) that a direct relationship between the programs receiving federal funds and the conditions attached to those funds is required. In this case, giving due deference to Congress' determination that such a relationship exists, the Court agrees with plaintiffs that there are a myriad of direct connections between the funds made available to state prisons and the restrictions imposed by RLUIPA. On the most basic level, the exercise of religion by prisoners, and the presumed rehabilitative benefits derived from that exercise, pervade the entire prison environment. Moreover, plaintiffs have identified specific programs within ODRC (see Plaintiffs' Joint Reply to Defendants' Motion to Dismiss, at 19) which both receive federal funding and deal specifically with inmate rehabilitation. This connection is at least as direct as that between funds allocated for highway construction and the minimum drinking age. Given the discretion granted to Congress to determine, in the first instance, the need to enact specific legislation to further the general welfare, and the precept that courts may strike down otherwise properly-enacted federal legislation only if it clearly exceeds constitutional limits on the Article I power, the Court concludes that the relationship between federal funds re-

ceived by ODRC and the religious practices of inmates confined in institutions under the jurisdiction of the ODRC is sufficiently direct to insulate RLUIPA from this particular constitutional challenge.

### 4. *Whether RLUIPA violates the Establishment Clause*

■ Finally, defendants maintain that RLUIPA violates the Establishment Clause as well as the Tenth Amendment to the United States Constitution. The Tenth Amendment issue will be addressed later in this Report and Recommendation. For the following reasons, the Court concludes that RLUIPA does not violate the First Amendment's Establishment Clause.

■ The Establishment Clause of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion." U.S. CONST. Amend. I. Although some members of the Court have recently expressed their discontent with the three-part test contained in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), it remains the current standard by which to determine whether a statute violates the Establishment Clause. *Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000); *American Civil Liberties Union of Ohio v. Capitol Square Review and Advisory Board,* 243 F.3d 289 (6th Cir.2001). To pass constitutional muster, the statute in question (1) must have a secular legislative purpose; (2) its principal or primary effect must neither advance nor inhibit religion; and (3) the statute must not foster an "excessive government entanglement" with religion. *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105; *Capitol Square Review,* 243 F.3d at 306. Defendants, citing to *Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) and *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 109 S.Ct. 890,

103 L.Ed.2d 1 (1989), contend that RLUIPA fails the second prong of this test because it constitutes an impermissible government endorsement of religion and would also impermissibly burden third parties such as prison staff or other inmates.

In the Court's view, defendants' *Lemon* argument is completely foreclosed by *Corporation of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). *Amos* also involved an Establishment Clause challenge to a federal statute—in that case, 42 U.S.C. § 2000e–1, § 702 of Title VII of the Civil Rights Act of 1964—which exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion. The district court had concluded that the exemption had the primary effect of advancing religion, thus running afoul of the second prong of the *Lemon* test. In so concluding, the district court found it significant that only religious organizations obtained a benefit from the operation of the statutory exemption, and that it "burden[ed] the free exercise rights of employees of religious organizations who work in nonreligious jobs." *Id.* at 333, 107 S.Ct. 2862.

The Supreme Court unanimously reversed the district court, specifically rejecting its reasoning about the effects of § 702. In so doing, it held, first, that governments may, in their effort to accommodate religion, go beyond what is minimally required of them by the Free Exercise Clause without running afoul of the Establishment Clause. *Id.* at 334–35, 107 S.Ct. 2862. Second, it noted that government is permitted, under *Lemon,* "to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions" so long as the government does not

"abandon[ ] neutrality and act[ ] with the intent of promoting a particular point of view in religious matters." *Id.* at 335, 107 S.Ct. 2862. The Court rejected the notion that any law which makes it easier for a religion to carry out its mission is unconstitutional, noting that "religious groups have been better able to advance their purposes on account of many laws that have passed constitutional muster," such as laws which provide tax exemptions to religious organizations or which permit school supplies to be loaned to students attending parochial schools. *Id.* at 336, 107 S.Ct. 2862. What is prohibited is the "*government* itself ... advanc[ing] religion through its own activities and influence." *Id.* at 337, 107 S.Ct. 2862. Finally, the Court rejected the notion that a law which singles out religions for the benefit it confers is *per se* unconstitutional. If that were so, any law designed to minimize the burdens otherwise placed on religion by governmental regulation would fail. As the Court concluded, "[w]here ... government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption come packaged with benefits to secular entities." *Id.* at 338, 107 S.Ct. 2862.

Somewhat surprisingly, defendants' initial memorandum does not even cite to *Amos*, let along attempt to distinguish it. Defendants' Memorandum, at 42–44. In their reply memorandum, defendants offer two bases for distinguishing *Amos* from the facts of this case: (1) that the statutory exemption at issue in *Amos* "did not give the beneficiaries anything they did not already have before Congress initially legislated in the area," *id.* at 32, and (2) that the effect of § 702 was simply to "[withdraw] the sovereign from the dispute between the beneficiary and the third party [i.e. the affected employee]" as opposed to having the government "[weigh] in on behalf of religious beneficiaries in their

disputes with third parties." *Id.* at 34. They continue to rely on *Calder* and *Texas Monthly* as countervailing authority, noting that they do not disagree with the fundamental principle, recognized in *Amos*, that the government may lawfully provide additional accommodations for religious practices not mandated by the Free Exercise Clause, but contending that these accommodations are not permissible if they impose burdens on third parties as a result. *Id.* at 29–30. The specific burdens that defendants point to are the lessening of protection for prison staff and other inmates that, in their view, will necessarily result from increased accommodation of prisoners' religious practices.

It is true that the statutory scheme involved in *Amos* first imposed a restriction on the ability of all private employers, including religious organizations, to discriminate on the basis of religion, and then exempted religious organizations from that restriction, thus restoring them to the same status they enjoyed prior to the enactment of Title VII. Laws providing for tax exemptions fall into the same category. However, the same cannot be said for the statute at issue in *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), which conferred upon parochial school children the right to receive loaned textbooks free of charge, a right they did not enjoy prior to the passage of the statute, and certainly not one conferred upon them by the Constitution. *Allen* was cited by *Amos* with approval as an example of a law that both assisted a religious organization in carrying out its religious mission and which passed constitutional muster under the *Lemon* test. *Amos*, 483 U.S. at 336–37, 107 S.Ct. 2862. In short, defendants have attempted to graft onto the *Lemon* test an additional requirement that government may not legislate to provide any accommodations to religion unless those accommodations are

either constitutionally mandated by the Free Exercise Clause or take the form of exemptions from laws of general application that impose a burden on the free exercise of religion, even if that burden could be constitutionally imposed. Not surprisingly, there is no authority to support this additional requirement, and *Amos* cannot be properly distinguished from this case on that ground.

*Texas Monthly* and *Caldor* provide no support for defendants' position. Defendants cited *Texas Monthly* for the proposition that "an endorsement [of religion] occurs if government provides a benefit to religious adherents that is not necessary to avoid a Free Exercise violation and that benefits imposes burdens on third parties." Defendants' Memorandum, at 42. In fact, *Texas Monthly* dealt with the vastly different issue of government *subsidies* to religion, *Texas Monthly*, 489 U.S. at 15, 109 S.Ct. 890 (Brennan, J.), and specifically rejected Texas' argument that its tax subsidy for religious publications was sustainable on grounds that it was reasonably necessary to accommodate the free exercise of religion. *Id.* at 18 & n. 8, 109 S.Ct. 890. Justice Brennan, speaking for only three members of the Court, did indicate, in *dictum*, that even reasonable accommodations of free exercise such as the one approved by the Court in *Amos* might fail if they imposed monetary costs or other substantial burdens on third parties in the form of an increased tax burden. *Id.; see also Children's Healthcare is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084 (8th Cir.2000), *cert. denied*, 532 U.S. 957, 121 S.Ct. 1483, 149 L.Ed.2d 372 (2001). However, defendants have not cited a single case in which such a law has been held unconstitutional on that ground.

*Caldor*, which is cited by defendants as such a case (and also referred to as a "unanimous opinion," Defendants' Reply, at 30, even though Justice Rehnquist dissented), actually held that the statute at issue there, which allowed any employee to choose not to work on his or her designated Sabbath, violated the Establishment Clause because it had "the primary effect [of] impermissibly advanc[ing] a particular religious practice." *Caldor*, 472 U.S. at 710, 105 S.Ct. 2914. Moreover, it did so without regard to the consequences to persons who did not benefit from the statute's protection. However, to the extent that *Caldor* considered the burden imposed upon third parties as a factor in determining whether the statute impermissibly advanced a particular religious practice, it is easily distinguished from this case.

In *Caldor*, the right granted to persons whose religion included a Sabbath (and, of course, that is not a universal religious observance) was made absolute, and no countervailing interests of employees or co-workers were permitted to outweigh it. If RLUIPA commanded the states to accommodate any *bona fide* religious practice of institutionalized persons without regard to considerations of prison security, it would suffer from a similar defect. However, RLUIPA specifically permits safety and security—which are undisputedly compelling state interests—to outweigh an inmate's claim to a religious accommodation so long as there is a sufficient nexus between that interest and the denial of the requested accommodation, and there is no reasonable alternative to denial that would accommodate both the free exercise of religion and the need to maintain order in the prison environment. Although defendants, citing to their experience under RFRA, contend that it is factually impossible to provide the kind of accommodations that RLUIPA will require without significantly compromising prison security or the levels of service provided to other inmates, the Court does not believe it is appropriate to make such a factual finding on this record. Further, it seems unlikely that one court

could strike down an entire statute on constitutional grounds simply because one state claims to have had difficulty meeting the requirements of a similar statute in the past. At a minimum, *Caldor* would seem to suggest that the constitutional infirmity of a statute like RLUIPA would flow from consequences that are evident or on the face of the statute and which, due to the absolute nature of the statute's requirements, cannot be avoided by any amount of statutory interpretation. Where, as here, it is an open question as to the extent of the burdens (if any) RLUIPA will necessarily place on third parties such as other inmates or taxpayers, and where the courts will be given the chance to interpret RLUIPA's requirements in order to avoid placing unconstitutional burdens on others in order to accommodate the free exercise of religion, the statute will withstand the kind of challenge that defendants raise. Additionally, it is worth noting that although no other federal court has decided whether RLUIPA violates the Establishment Clause, every circuit court considering a similar challenge under the comparable provisions of RFRA found that it did not and does not violate the Establishment Clause. *See Mockaitis v. Harcleroad,* 104 F.3d 1522, 1530 (9th Cir.1997); *Flores v. City of Boerne,* 73 F.3d 1352, 1364 (5th Cir.1996); *Sasnett v. Sullivan,* 91 F.3d 1018, 1022 (7th Cir.1996); *EEOC v. Catholic Univ.,* 83 F.3d 455, 470 (D.C.Cir.1996).

Finally, Defendants argue that RLUIPA violates an overarching principle of Spending Clause constitutional jurisprudence, namely that the pressure exerted on the states to accept the conditions placed on the grants rises to the level of coercion. *See, e.g., Dole,* 483 U.S. at 211, 107 S.Ct. 2793; *Steward Machine Co. v. Davis,* 301 U.S. at 590, 57 S.Ct. 883. Although the case law discussing this aspect of the Spending Clause provides little guidance, the Court notes that the federal funds at issue in this case, even if withheld in their entirety, constitute less than 1% of the entire budget of the ODRC. See Defendants' Memorandum at 20. While the Court has no doubt that these funds would be missed, the fact remains that the potential loss of this relatively small amount of the funding by the States does not cross the generalized line established by the prior cases and turn enticement into compulsion. *See generally, Dole,* 483 U.S. at 211, 107 S.Ct. 2793 (loss of 5% of federal highway funds not coercive); *Steward Machine Co. v. Davis,* 301 U.S. at 590, 57 S.Ct. 883. Here, as in *Dole,* "Congress has offered relatively mild encouragement to the States" to achieve a desired objective. *Dole,* 483 U.S. at 211, 107 S.Ct. 2793. The guiding principle established by the Supreme Court in *Steward Machine Co.* almost sixty years ago still holds true today:

> [E]very rebate from a tax when conditioned upon conduct is in some measure a temptation. But to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties. The outcome of such a doctrine is the acceptance of a philosophical determinism by which choice becomes impossible. Till now the law has been guided by a robust common sense which assumes the freedom of the will as a working hypothesis in the solution of its problems.

*Id.,* 301 U.S. at 589–590, 57 S.Ct. 883. This Court will not conclude, on the facts before it, that the Defendants would be forced to surrender their position as coequal sovereigns in the federal system as a result of the conditions expressed in RLUIPA. *See New York,* 505 U.S. at 167, 188, 112 S.Ct. 2408. Accordingly, after considering all of defendants' contentions, the Court finds RLUIPA to be a proper exercise of Congressional power pursuant to the Spending Clause.

## IV.

Defendants maintain that regardless of whether RLIUPA is deemed to be a constitutional exercise of Congress' power, the Tenth Amendment and the Eleventh Amendment provide the state with immunity. These issues do not require extended discussion.

### A. *Tenth Amendment Immunity*

■ The Tenth Amendment to the United States Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." This provision has long been interpreted by the Court to ensure that the federal government remains one of "limited powers," *Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), determining "what powers in fact have been given [to it] by the people." *United States v. Butler*, 297 U.S. 1, 63, 56 S.Ct. 312, 80 L.Ed. 477 (1936).

First, the Court has already held that RLUIPA is a constitutional exercise of the Spending Power. The Supreme Court conclusively held in *Dole* that the Tenth Amendment stands as no independent constitutional bar to such legislation. *Id.*, 483 U.S. at 210–11, 107 S.Ct. 2793. Accordingly, Defendants' Tenth Amendment argument necessarily fails. Defendants seek, however, to extend the reach of a number of relatively recent Supreme Court decisions, including *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), and *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), to establish a new type of Tenth Amendment immunity constituting a "structural immunity from suit that extends beyond the Eleventh Amendment." Defendants' Memorandum, at 52. Defendants' are correct that the scope of the state's sovereign immunity "neither derives from nor is limited by the terms of the Eleventh Amendment." *Alden*, 527 U.S. at 713, 119 S.Ct. 2240. However, *Alden* simply held that the Constitution did not give Congress the power to waive a state's sovereign immunity from suit in its own courts. In *Alden*, the legislature at issue was not passed pursuant to any Congressional power to affect the states' sovereign immunity under the Eleventh Amendment or otherwise. *Alden* did not affect the Court's holdings in other cases that the determination of whether a particular statute violates the Tenth Amendment is necessarily a determination of whether Congress was within its enumerated powers in passing the contested legislation:

> Congress exercises its conferred powers subject to the limitations contained in the Constitution. Thus, for example, under the Commerce Clause Congress may regulate publishers Engaged in interstate commerce, but Congress is constrained in the exercise of that power by the First Amendment. The Tenth Amendment likewise restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, as we have discussed, is essentially a tautology. Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States. The Tenth Amendment thus directs us to determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an Article I power.

*New York*, 505 U.S. at 156–157, 112 S.Ct. 2408. Because Congress acted constitutionally under the Spending Clause in passing RLUIPA, Ohio's Tenth Amend-

ment rights necessarily have not been violated.

### B. Eleventh Amendment Immunity

██ The Eleventh Amendment provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. Amend. XI. Although the text of the Amendment creates no immunity against citizens attempting to sue their own state, it has long been settled that the Amendment, representing the concept of states as co-equal sovereigns with the federal system bars such suits. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting states was not contemplated by the Constitution when contemplating the judicial power of the United States.")(internal citations and quotation marks omitted); *see also Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Furthermore, suits which raise civil claims against state officials for actions committed while serving in their official capacity but are, in essence, a claim against the state are barred by the Eleventh Amendment. *See Ford Motor Co. v. Department of Treasury of State of Indiana,* 323 U.S. 459, 462–464, 65 S.Ct. 347, 89 L.Ed. 389 (1945)(holding that when action is essentially one for recovery of money from the state, even though individual officers are nominal defendants, the state is the real, substantial party in interest and entitled to sovereign immunity under the Eleventh Amendment).

██ Although Congress has the power to abrogate a state's Eleventh Amendment immunity pursuant to Section 5 of the Fourteenth Amendment, *see Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), in *Seminole Tribe,* the Court expressly overruled contrary precedent (*Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989)) and firmly established that Congress may not abrogate state sovereign immunity under any of its Article I powers. *See Seminole,* 517 U.S. at 72–73, 116 S.Ct. 1114; *see also Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank,* 527 U.S. 627, 636, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999). Defendants claim that because Congress purported to pass RLUIPA pursuant to its Commerce Clause powers and because neither the State of Ohio nor the ODRC waived its Eleventh Amendment immunity, Defendants are immune from suit under RLUIPA. Here, the Court has held that RLUIPA was validly enacted pursuant to Congress' Spending Clause powers. In accepting the terms of the federal grants, Defendants necessarily accepted all of the conditions Congress established for funds eligibility. While the Court in *Florida Prepaid* may have found the doctrine of constructive waiver inapplicable in the Commerce Clause context, they did not find the Spending Clause powers so limited:

> [W]e have held in such cases as *South Dakota v. Dole* that Congress may, in the exercise of its spending power, condition the grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions. *These cases seem to us fundamentally different from the present one.*

*Id.,* 527 U.S. at 686, 119 S.Ct. 2219 (emphasis added)(internal citations omitted). As a result, the state's acceptance of the terms pursuant to the Spending Clause necessarily establishes its acquiescence to § 2(a) of the Act, providing that "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceed-

ing and obtain appropriate relief against a government," where the term "government" includes a state, its departments, or its officials. 42 U.S.C. § 2000cc–5(4)(A).

■ Even had the defendants not consented to suit under the Act, the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) remains good law in providing that plaintiffs, as here, may bring a suit against a state official seeking prospective injunctive or declaratory relief to conform their behavior to comply with federal law without running afoul of the Eleventh Amendment. *See Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). Despite Defendants' insistence to the contrary, RLUIPA is valid federal law, and *Ex parte Young* serves to insure that Plaintiffs can maintain an action against defendants to enforce compliance with the statute.

Defendants also contend that this is a case like *Coeur d'Alene*, so that a suit under RLUIPA which proceeds on an *Ex Parte Young* theory would violate the Eleventh Amendment. In *Coeur d'Alene*, an Indian tribe filed suit in federal court seeking to validate its claim of ownership to lands submerged under Lake Coeur d'Alene and certain surrounding rivers and streams. The Court held that the suit was the functional equivalent of an action to quiet title, which the Eleventh Amendment clearly prohibited, and that the state's interest in possession and control over property lying within its boundaries was sufficiently strong to justify recognition of a unique sovereign interest inconsistent with the application of the *Ex Parte Young* exception. *See Coeur d'Alene*, 521 U.S. at 286–288, 117 S.Ct. 2028; *Ford Motor Company v. Department of Treasury of Ind.*, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945).

Defendants claim that the same principle should apply to suits brought under RLUIPA because the relief available to prisoners—changing the way the state administers the religious exercise portion of its prison programs—is "the functional equivalent of relief that could not be obtained directly against the state under the Eleventh Amendment," Defendants' Memorandum, at 50, or because RLUIPA is a statute of "dubious constitutionality" and therefore represents a unique intrusion into the traditional state function of running a prison. Defendants' Reply, at 38. The Court has rejected the latter contention, and in any event is unaware of any decisions suggesting that the application of *Ex Parte Young* depends upon whether the underlying federal statutory right to be enforced is one whose constitutionality may fairly be subject to debate. As to the former contention, the Eleventh Amendment clearly does not now prohibit prisoners from utilizing *Ex Parte Young* to obtain accommodations for their religious practices. The only difference is that the courts have judged the states' policies under the more deferential *Turner* standard. However, a decision favoring a prisoner in such a case still may require a prison to "rewrite" its policies, the very relief which defendants contend is unavailable under the Eleventh Amendment. Additionally, this is not a case like *ANR Pipeline v. Lafaver*, 150 F.3d 1178 (10th Cir.1998), where Congress itself had, through the Tax Injunction Act, expressly recognized the states' sovereign interest in assessing and collecting taxes without significant federal interference. RLUIPA is an obvious Congressional determination that the states do not have an interest in regulating the religious exercise of institutional persons that cuts to the very core of state sovereignty, and this Court is not persuaded that it should so hold.

V.

Based on the foregoing, it is recommended that the Court find RLUIPA, 42 U.S.C. §§ 2000cc *et seq.*, to be a constitu-

tional exercise of Congress' Spending Power. Furthermore, it is recommended that the Court find that neither the Tenth nor Eleventh Amendments provide the defendants with immunity from RLUIPA's provisions. Consequently, it is recommended that defendants' motion to dismiss, with the exception of that portion directed to plaintiffs' claims under the Ohio Constitution, be denied.

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within ten (10) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Aug. 27, 2001.